# THE UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| In re: | ) Chapter 15 |
| RIVIERA MARINE (INT.) PTY LIMITED (receivers and managers appointed), *et al*,[1] | ) Case No. 10-[_____] (___) |
| Debtors in a Foreign Proceeding | ) (Joint Administration Requested) |

## DECLARATION OF STEPHEN JAMES PARBERY IN SUPPORT OF PETITION FOR RECOGNITION AND CHAPTER 15 RELIEF

I, Stephen James Parbery, pursuant to 28 U.S.C. §1746, hereby declares under penalty of perjury under the laws of the United States of America as follows:

1. I am over the age of 18 and, unless otherwise indicated, all facts set forth in this declaration (this "Declaration") are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) my opinion based upon my experience and knowledge of the Chapter 15 Debtors'[2] operations; or (d) my opinion based upon information and documents provided to me by the Receivers. If called to testify, I could testify competently to the facts set forth herein.

---

[1] The Chapter 15 Debtors are: Riviera Marine (Int.) Pty Limited (receivers and managers appointed) (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); Riviera Coomera Pty Limited (receivers and managers appointed) (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); Riviera Marine (MFG) Pty Limited (receivers and managers appointed) (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); Riviera Runaway Bay Pty Limited (receivers and managers appointed) (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); and R Marine Pittwater Pty Limited (receivers and managers appointed) (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number). The location of the Chapter 15 Debtors' corporate headquarters and the service address for all of the Chapter 15 Debtors is: 50 Waterway Drive, Coomera, Queensland, Australia, 4209.

[2] Unless otherwise defined in this Declaration, all capitalized terms used herein shall have the meanings set forth in the *Petition for Recognition and Chapter 15 Relief* (the "Petition"), filed concurrently herewith.

2. I am a partner of the Australian accounting firm PPB ("PPB"), which specializes in insolvency accounting, and I work and reside in Sydney, Australia. I was the joint and several administrator of the Chapter 15 Debtors prior to the commencement of the Australian Proceeding, and I was the joint and several administrator of the DOCA. On May 19, 2009, Anthony Milton Sims, Grant Dene Sparks and I, all of PPB, were appointed joint and several voluntary administrators of the Company pursuant to section 436A of the *Corporations Act 2001 (cth)*. When the Chapter 15 Debtors executed the DOCA in February 2010, Anthony Milton Sims, Grant Dene Sparks, and I were appointed Deed Administrators.

3. On June 25, 2010, the Creditors' Trust was formally established by the execution of a Creditors' Trust Deed as provided for by the DOCA. Currently, I am a director of the trustee company which controls the Creditors' Trust. As such, I am generally familiar with the Chapter 15 Debtors' operations, business affairs, and books and records.

4. As one of the joint and several voluntary Administrators of the Chapter 15 Debtors, I gained a high level of knowledge of each of the Chapter 15 Debtors' structure, operations, and finances during the investigation of the Chapter 15 Debtors, which commenced at the time the Administrators were appointed in May 2009.

5. I submit this Declaration in support of the Petition.

**I.     Background of the Company**

   **A.     The Company's Business and Operations**

6.     The Chapter 15 Debtors are one of the largest luxury recreational boat manufacturers in Australia, and are a major participant in the global luxury recreational marine industry. The principal activities of the Chapter 15 Debtors include the manufacture and wholesale of luxury boats which range from 33 to 70 feet in length.

7.     For the financial year ending June 30, 2008, the Chapter 15 Debtors sold 327 boats, with sales totaling (before factory incentives) approximately $265 million. For the financial year ending June 30, 2009, the Chapter 15 Debtors sold 139 boats, with sales totaling (before factory incentives) approximately $131 million. Finally, for the financial year ending June 30, 2010, the Chapter 15 Debtors sold 52 boats, with sales totaling (before factory incentives) approximately $54 million.

8.     Historically, approximately 60% of the Company's sales have been in Australia and Asia, 15% in Europe and the Middle East, and 25% in the U.S., Canada, and South America. Currently, given a substantial downturn in the European and American markets, approximately 85% of the Company's sales are in Australia and Asia, 9% are in Europe and the Middle East, and 6% are in the U.S., Canada, and South America. The Company's manufacturing facilities are located in Australia, and all of the Chapter 15 Debtors' approximately 292 employees are located in Australia.

9.     The Chapter 15 Debtors have no assets or operations in the United States, other than as set forth in paragraph 10 below, as all assets and liabilities of RYA, a former U.S. subsidiary of the Parent Company, were assigned to Riviera Marine (Int.) Pty

Limited on December 31, 2008. RYA was subsequently dissolved on February 20, 2009, by resolution of the Company's shareholders.

10. Riviera Marine (Int) Pty Ltd. registered a 100% owned subsidiary in the United States in or around July 2009, RYUSA, to conduct warranty work on behalf of the Company.

B.  The Chapter 15 Debtors' Capital Structure

11. Since 2002, as a result of a management buyout, the Chapter 15 Debtors' only shareholder is the Parent Company. To fund the buyout, the Parent Company entered into a $75 million loan with ANZ Fiduciary Services Pty Limited whereby the assets of the Chapter 15 Debtors were pledged as security for the loan to ANZ Fiduciary Services, Pty Limited, and as security for the Security Trustee. Further advances were made on this secured loan over the next approximately 6 years, and together with a trade finance facility and a floorplan finance facility dated as of July 2010, the Chapter 15 Debtors' debt owed to the Secured Lenders, together with accrued interest, is approximately $119.4 million. In addition to the funding by the Secured Lenders, the Parent Company's majority shareholders loaned the Chapter 15 Debtors funds through unsecured notes. Subsequent to the appointment of the receiver over the Parent Company, ANZ Banking Group Pty Ltd provided a $15 million working capital facility to the receivers (on behalf of the Parent Company). The working capital facility is also secured by the securities pledged to the Security Trustee. The Chapter 15 Debtors have no other secured debt in the capital structure.

C.  **Impact of the Global Economic Slowdown on the Chapter 15 Debtors**

12. Concerns about the Chapter 15 Debtors' ability to remain solvent were raised in the Company's audited 2008 financial statements, which explained that the significant financial outcomes that arose from the global credit crisis and economic slowdown and the one off costs reflected in the 2008 results were:

> (a) a reduction in the expected recoverable value of inventory of $10.7 million;
>
> (b) non-recurring restructure and redundancy costs of $3.1 million; and
>
> (c) foreign exchange losses of $8.8 million.

As a result of these losses, the Chapter 15 Debtors had a working capital deficiency in 2008. Additionally, the Company's significant reduction in net assets in 2007 and 2008 led to a significant increase in the Company's borrowings from its shareholders and a debt restructuring exercise conducted with the secured lenders, which were needed to fund both the 2008 financial operational losses and an increase in inventory. The Chapter 15 Debtors were also unable to service the interest payments on their secured debt during this time. Though the Parent Company tried to work with the Secured Lenders to restructure the secured debt, those discussions proved unsuccessful.

13. A number of business woes in 2008 also contributed to the Chapter 15 Debtors' financial decline. Though the Chapter 15 Debtors geared up their manufacturing facility to produce 327 boats in the 2008 financial year, and invested a significant amount of money in capacity and new production development, the Company

K&E 17484833.6

experienced a sharp decline in demand beginning in January 2008, and the Company's related production cuts in response to the decline in demand lagged six months behind. Also adding to these difficulties was the fact that a number of the Company's new models were either unsuccessful or late to market, and the Company underwent a management change in July 2008. The resulting significant downsizing in capacity, people, and stock at low and negative margins absorbed a large amount of the Company's cash reserves otherwise available.

### D. The Voluntary Administration and DOCA

14. On May 8, 2009, it was noted at the Parent Board Meeting that the Company should request the Secured Lenders to appoint a receiver over the assets of the Company on terms of the draft letter which had been circulated by their solicitors on May 7, 2009, and that the relevant officers and employees of the Company had been instructed by the Parent to immediately cease incurring financial indebtedness.

15. On May 8, 2009, Christopher Campbell, Vaughan Strawbridge and Richard Hughes of Deloitte were appointed by the Secured Lenders as the Receivers.

16. On May 19, 2009, it was resolved at a general meeting of directors that the Company was insolvent or likely to become insolvent at some time in the future, and it was noted that a consent to act as voluntary administrator had been given to the Administrators. It was also resolved that the Administrators be appointed voluntary administrators of the Company pursuant to section 436A of the Corporations Act.

17. Following their appointment, the Administrators investigated the Company's records for evidence of:

(a) unfair preference payments;

(b) uncommercial transactions;

(c) unfair loans;

(d) unreasonable director related transactions;

(e) voidable charges;

(f) related party transactions which may be voided where the company was insolvent at the time of the transaction; and

(g) insolvent trading.

Additionally, the Administrators identified and dealt with the Company's potential creditors worldwide.

18. Following these investigations, at a meeting of creditors on January 22, 2010 held in accordance with section 439A of the Corporations Act, and with the exception of one creditor, the creditors unanimously resolved that the Chapter 15 Debtors execute a deed of company arrangement.

19. As required under section of the Corporations Act after such a vote, the Chapter 15 Debtors executed a DOCA on February 12, 2010. The DOCA contained terms to the following effect:

(a) Employees and former employees of the Chapter 15 Debtors were to be paid 100% of their Employee Claims (as defined in the DOCA) by the Receivers and managers on or before April 30, 2010.

(b) On or before June 30, 2010, the Receivers and managers were to pay a contribution of $400,000 toward a creditors' trust for the unsecured creditors of the Chapter 15 Debtors. Under the terms of the Creditors' Trust Deed, the claims of unsecured creditors against the Chapter 15 Debtors, including those of U.S.-based unsecured creditors, were to be replaced with a right to receive a pro rata distribution from the Creditors' Trust with other unsecured creditors. If a DOCA had not been executed and the Chapter 15 Debtors had instead proceeded to liquidation under Part 5.6 of the Corporations Act, neither these funds nor any other funds would have been available to satisfy claims of unsecured creditors because the value of the debt owed to the Secured Lenders is likely to have exceeded the value of the Chapter 15 Debtors' assets.

(c) Upon execution of the Creditors' Trust Deed and creation of the unsecured creditors' rights to receive a distribution from the Creditors' Trust, all unsecured claims against the Company existing as of May 19, 2009 (the date of the appointment of the Administrators), including those of unsecured creditors located in the U.S., were to be extinguished and the DOCA was to terminate. Distributions from the Creditors' Trust will be paid as soon as practical after all claims are received and adjudicated.

The DOCA does not provide that the secured creditors be in any way prevented from realizing or otherwise dealing with their security and the Australian courts have entered no such order.

20. In order to make a claim under the DOCA, an unsecured creditor was required to lodge a proof of debt with the Deed Administrator. Pursuant to the Corporations Act and the Corporations Regulations an Administrator must admit, reject, or require further evidence in support of a proof of debt within 28 days of receiving a written request from a creditor to do so, or such longer period allowed by ASIC. All creditors, including those located in the U.S., received notice of how to participate in the proof of debt process.

21. Following the termination of the DOCA, persons who would have been entitled to make a claim under the DOCA as creditors of the Chapter 15 Debtors but have not as yet done so continue to be able to lodge a claim with the trustee of the Creditors' Trust. Pursuant to the Creditors' Trust Deed (which incorporates by reference the relevant provisions of the Corporations Act and the Australian Corporations Regulations) the Trustee must admit, reject, or require further evidence in support of a proof of debt within 28 days of receiving a written request from a creditor to do so.

### E. Current Status of the Australian Proceeding and Commencement of the Chapter 15 Cases

22. On June 30, 2010, the Administrators notified the ASIC that the DOCA had been wholly effectuated. Accordingly:

    (a) each unsecured claim against the Chapter 15 Debtors was released, discharged and extinguished pursuant to clause 10.1 of

the DOCA and pursuant to section 444D(1) of the Corporations Act;

(b) each unsecured claim against a Chapter 15 Debtor was replaced with a right to participate in the distribution of the Creditors' Trust;

(c) pursuant to clause 16.4 of the DOCA certain provisions of the DOCA continue to have effect notwithstanding that the DOCA has been effectuated including clause 10.1 (pursuant to which each unsecured claim against the Chapter 15 Debtors was released, discharged and extinguished); and

(d) the trustee of the Creditors' Trust is required to proceed to distribute the Creditors' Trust to unsecured creditors in accordance with the terms of the Creditors' Trust Deed (which, as noted above, also allows for creditors who would have been entitled to make a claim under the DOCA as creditors of the Chapter 15 Debtors, but have not yet done so, to lodge a claim with the trustee of the Creditors' Trust). Such creditors' entitlements to those distributions are currently being reviewed by the trustee of the Creditors' Trust and a distribution will be paid shortly to those Creditors' whose claims are accepted by the trustee.

**II.     I Qualify as a Foreign Representative**

23.     It was resolved at a general meeting of directors of the Chapter 15 Debtors that a consent to act as voluntary administrator had been given of the Administrators and resolved that the Administrators be appointed voluntary administrators of the Company pursuant to section 436A of the Corporations Act.  Further, pursuant to clause 2.2 of the DOCA, I was appointed as one of the administrators of the DOCA.

24.     Pursuant to Part 5.3A of the Corporations Act and the authority given to me under the DOCA, I was at all relevant times (including at the time the DOCA was effectuated and the release and extinguishment of unsecured claims took effect) authorized to administer the reorganization of the Chapter 15 Debtors' affairs in accordance with the DOCA, including by distributing the funds received from the receivers to the trustee of the Creditors' Trust.  Further, I was empowered and required by the DOCA to distribute funds received from the receivers and managers in accordance with the DOCA.

25.     Accordingly, to the best of my information and belief, I believe that I am a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

**III.    The Australian Proceeding is a Foreign Main Proceeding for the Australian Chapter 15 Debtors**

26.     To the best of my information and belief, I believe that the Australian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code, as Australia is the Chapter 15 Debtors' COMI.

27.     <u>The Location of the Chapter 15 Debtors' Headquarters</u>.  The Chapter 15 Debtors all are corporations organized and existing under the laws of Australia, and have

no corporate presence other than the Company's Coomera, Queensland headquarters (which serves as the headquarters for each of the Chapter 15 Debtors).

28. <u>The Location of Those Persons or Entities Managing the Chapter 15 Debtors</u>. Each of the Chapter 15 Debtors' officers, directors, and employees are permanently located in and work in Australia. Further, strategic planning for the Chapter 15 Debtors takes place at the Company's Coomera, Queensland headquarters and all budgets and business plans ultimately get approved by managers operating in Coomera, Queensland. In addition, pricing, sales programs, and procurement for the Chapter 15 Debtors are ultimately approved by the Company's headquarters in Coomera, Queensland.

29. <u>The Location of the Chapter 15 Debtors' Primary Assets</u>. The Chapter 15 Debtors are each Australian corporations, with substantially all of their assets located in Australia. In particular, the Company's employees and manufacturing facility is located in Australia.

30. <u>The Location of the Majority of the Chapter 15 Debtors' Creditors Affected By the Australian Proceeding</u>. The majority of the Chapter 15 Debtors' creditors affected by the Australian Proceeding are located in Australia. If fact, more than 85 percent in number and 90 percent in dollar amount of the Chapter 15 Debtors' unsecured creditors are located in Australia.

31. <u>The Jurisdiction Whose Law Would Apply To Most Disputes</u>. As the Chapter 15 Debtors are Australian corporations conducting the majority of their business in Australia, Australian law would apply to most disputes involving the Chapter 15

Debtors.  In particular, the principal financing agreements relating to the Chapter 15 Debtors (including a loan agreement originally dated October 4, 2002, and a working capital facility agreement originally dated October 4, 2002) are each governed by the laws of New South Wales, Australia.  Further, most agreements with the Company's dealers around the world are governed by the laws of Queensland, Australia.

32. <u>Other Factors Demonstrating Australia is the Center of Main Interest of the Chapter 15 Debtors</u>.  Several other factors demonstrate that Australia is the Chapter 15 Debtors' center of main interest.  First, substantially all of the books and records of the Chapter 15 Debtors are maintained in Coomera, Queensland.  Second, all of the officers and directors who were appointed to the Chapter 15 Debtors immediately prior to the administration are located in Australia, and all board meetings were held in Australia.  Third, the Company's sales teams located outside of Australia are required to coordinate with dealer relationship managers and other relevant staff located in Australia to order products, confirm pricing, and deal with certain other corporate matters.  Fourth, all key activities associated by the Chapter 15 Debtors either occurs in Australia, or requires approval from employees located in Australia before proceeding.

K&E 17484833.6

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 8, 2010
Sydney, Australia

_____
Stephen James Parbery
Foreign Representative
Joint and Several Administrator